**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI**

ANNETTE AND BRYAN HODGES,     )
                              )
    Plaintiff,          )
                              )
vs.                           )          Case No.
                              )
COMMUNITY HOUSING             )
MINISTRY, INC. d/b/a COMMUNITY )
HOUSING MANAGEMENT,           )
Serve: Registered Agent       )
      Belinda Ray            )
      730 S. 6th Street      )
      St. Joseph, Missouri, 64501 )
                              )
and                           )
                              )
MBL DEVELOPMENT CO.,          )
Serve: Registered Agent       )
      Zachary Adam Goff      )
      601 NW Jefferson St.   )
      P.O. Box 550           )
      Blue Springs, Missouri, 64013 )
                              )
    Defendant.          )

## COMPLAINT

Plaintiffs Annette Hodges ("Annette") and Bryan Hodges ("Bryan," or collectively, "Plaintiffs"), for their complaint against Defendants Community Housing Ministry, Inc. ("CHM") and MBL Development Co. ("MBL"), state as follows:

### INTRODUCTION

1.     Annette and Bryan Hodges took great pride in providing a quality housing experience to the hundreds of low-income tenants that they served over the years at Deer Brook Villas in Sedalia, Missouri.

1

2. For the last several years, both Plaintiffs—husband and wife—worked for the Defendants.

3. Annette worked as the property manager for Deer Brook Villas, which is owned by the Defendants and which contains scores of apartment units that have housed many of mid-Missouri's indigent and elderly citizens.

4. Bryan worked his tail off for the Defendants as the maintenance man for Deer Brook Villas.

5. Plaintiffs held the residents of Deer Brook Villas in the highest regard, and that feeling was mutual.

6. Despite their stellar performance at Deer Brook Villas and at other properties owned by the Defendants, the Plaintiffs lost their jobs at Deer Brook Villas.

7. The reason for their termination was simple, according to Mr. D. Kim Lingle ("Lingle"), the owner of Deer Brook Villas.

8. The Plaintiffs did not "play in the sandbox" that Lingle wanted them to play in.

9. The "sandbox," as Lingle would have had it, was a workplace full of lawlessness—one that permitted Lingle to continue to receive state and federal monies even when his companies were in violation of the law, one that permitted Lingle's employees to harass Annette and other female employees, and one that routinely discriminated against tenants in a myriad of ways.

10. Because they filed complaints and instituted proceedings that threatened to expose Defendants' corrupt and illegal business practices—and embarrass Lingle, who likes to tout his connections around the State of Missouri and elsewhere—Defendants summarily terminated Plaintiffs' employment on December 13, 2019.

2

## PARTIES, JURISDICTION AND VENUE

11.     Plaintiffs are individuals residing in Missouri.

12.     CHM is a corporation organized and existing under the laws of the State of Missouri that can be served through its registered agent, Belinda Ray, at 730 South 6th Street, St. Joseph, Missouri, 64501.

13.     CHM does business as Community Housing Management.

14.     MBL is a corporation organized and existing under the laws of the State of Missouri that can be served through its registered agent, Zachary Adam Goff, at 601 NW Jefferson St., P.O. Box 550, Blue Springs, Missouri, 64013.

15.     The Court has jurisdiction over this action, which includes claims arising under the Fair Labor Standards Act (29 U.S.C. §§ 201, *et seq.*) (the "FLSA"), pursuant to 28 U.S.C. § 1331.

16.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) in that CHM and MBL (collectively, "Defendants") do business in Missouri and because the events or omissions giving rise to the subject matter of this action occurred in Missouri.

## FACTUAL BACKGROUND

17.     ***MBL Development Co.*** MBL develops and builds multi-family housing for families and senior citizens in and around Missouri and surrounding states.

18.     Lingle is the President and owner of MBL.

19.     Roger Jared ("Jared") is MBL's Construction Superintendent.

20.     Michelle Jennings ("Jennings") is MBL's Vice President of Development.

21.     Melody Costello ("Costello") is MBL's Operations and Office Manager, and she sits on CHM's Board of Directors.

3

22. MBL purports to develop and construct homes in accordance and in conjunction with government rental production guidelines under the Low-Income Housing Tax Credit program.

23. MBL developed, built, and has owned senior housing developments in various cities across Missouri, including Bolivar, Moberly, Clinton, Sedalia, Marshall, Oak Grove, Chillicothe, Maryville, and Carthage.

24. Additionally, MBL developed and built family developments in various cities across Missouri, including St. Joseph, Trenton, Bethany, Lamar, Chillicothe, Holden, Gallatin, Moberly, and Butler.

25. ***Community Housing Management.*** CHM is MBL's business partner, and along with MBL, owns and operates various rental properties in Missouri, including many of the senior and family developments mentioned in the preceding paragraphs.

26. CHM owns many of its properties with MBL, and since 2014, MBL and CHM have partnered to manage the properties that the two companies, together or separately, own and operate in the State of Missouri.

27. On MBL's website, MBL sets forth CHM's "Mission Statement" and indicates that CHM's Mission Statement—to develop, build, manage, and invest in quality affordable housing where our families would be proud to live—compliments the philosophy that MBL has strived to maintain throughout its existence.

28. Additionally, on MBL's website, MBL states that CHM strives to be a caring and compassionate organization that puts customers first and places the highest priority on providing affordable housing to those in need.

4

29.     On its website, MBL indicates that for "information regarding leasing," please contact CHM, and it then sets forth CHM's contact information.

30.     Sherry Smith ("Smith") is CHM's Executive Director.

31.     Tammy Gibson ("Gibson") is CHM's Assistant Executive Director.

32.     Tamara Wallace ("Wallace") is CHM's Compliance Officer and Regional Manager.

33.     Donna Beaderstadt ("Beaderstadt") is CHM's Treasurer.

34.     CHM's Board of Directors is comprised of four individuals: Penny Adams, Dave Howery, Alyysa Pickman, and Costello.

35.     ***Annette and Bryan Hodges.*** Each of MBL's and CHM's properties is staffed with a property manager and maintenance staff.

36.     Annette has been the property manager for one of Defendants' properties, Deer Brook Villas, in Sedalia, Missouri, since approximately August 2013.

37.     Bryan has been the maintenance technician for Deer Brook Villas since July 4, 2016.

38.     In or around November 2016, Defendants opened Phase II of Deer Brook Villas, and at that time, Annette became a full-time employee for Defendants working 32 hours/week.

39.     Annette and Bryan's employment with Defendants was summarily and abruptly terminated on or about December 13, 2019.

40.     Prior to their termination, Annette's and Bryan's performance as the property manager and maintenance technician for Deer Brook Villas was exemplary.

41. Tenants at Deer Brook Villas were very fond of Annette and Bryan, and Defendants' employees raved about Annette's and Bryan's commitment to Deer Brook Villas, its tenants, and Defendants' shared missions.

42. Annette and Bryan both received raises in 2017, 2018, and in 2019.

43. In general, Annette's pay was based on the number of apartment units that she managed for the Defendants each month and ranged from $20 to $23 per unit per month over the course of her employment.

44. Generally, Bryan was paid a flat rate for certain maintenance tasks, and he was paid an hourly rate for other maintenance tasks.

45. Under Defendants' personnel policies, both Annette and Bryan were supposed to be eligible to receive benefits, such as health insurance, so long as they worked 32 hours per week.

46. ***MBL's Control Over Annette and Bryan.*** Over the years, MBL provided Annette and Bryan with significant input and direction on their day-to-day activities.

47. Jared would direct Annette and Bryan frequently and ask them for assistance with various items (*i.e.*, such as sending emails or completing tasks at the properties that Annette and Bryan worked at) that he needed help with.

48. Costello requested that Annette send pictures of the properties and complete other tasks for her.

49. Lingle and Jennings, for example, would frequently discuss the condition of Deer Brook Villas with Annette and Bryan, and they would indicate that they wanted certain actions taken with respect to the properties.

50. Lingle would advise Annette and Bryan that pre-emergent or fertilizer needed to be put down on the properties that they worked at.

6

51.     He would comment to Annette on the sightliness (or unsightliness) of the properties and instruct her to take action to remedy certain situations at the properties.

52.     He even indicated that he wanted Annette to take action (*i.e.,* evict a tenant to make an example of) against certain tenants to prove the point that Deer Brook Villas needed to be maintained in a certain, specified way that he directed.

53.     Lingle would frequently email Annette directly to ensure that she could be present at Deer Brook Villas at a particular time so that Annette could show, for example, Missouri Housing Development Commission ("MHDC") and other state government officials (including Governor Mike Parson and Treasurer Clint Zweifel) around the property.

54.     He would do the same and ask Annette to be present at Deer Brook Villas when appraisers showed up at the property.

55.     When Lingle's mother passed away in 2016, he had Annette assist with putting together a luncheon at his mother's funeral.

56.     He advised Annette that MBL had been awarded tax credits to build Deer Brook Villas II, and he thanked Annette for working with the tenants at the public hearings.

57.     In fact, in February 2017, MBL paid Annette $1,500 in connection with her work in getting tenants signed up and into Deer Brook Villas phase II.

58.     On August 1, 2019, Jennings sent Annette a Utility Release Form that Defendants needed for 22 units.

59.     On August 6, 2019, Jennings sent Annette a note requesting that Annette complete the Utility Release Forms by the end of the week.

60.     After Annette completed the forms by the end of the week, Jennings told Annette, "You are amazing. And thank you so so much."

7

61.     In 2019, MBL—through each of its employees, including its owner, Lingle—had input into the termination of Annette's and Bryan's employment, which, as Lingle remarked, had come about because the Hodges did not play in the "sandbox" as the Defendants wanted them to.

62.     ***Hodges' Work for Defendants at Other Properties***. In February 2019, at Defendants' request, Annette began working as the property manager at Defendants' property in Butler, Missouri.

63.     The property that she managed in Butler had forty-nine (49) units.

64.     Annette managed this property for one month.

65.     At or around this time, Defendants requested that Annette and Bryan take on responsibilities for the Defendants' properties in Clinton, Missouri.

66.     Defendants' properties in Clinton had seventy (70) units.

67.     Beginning in June 2019, Annette took on property management responsibilities and Bryan took on maintenance technician responsibilities for the Defendants' properties in Clinton.

68.     ***Annette and Bryan Begin Noticing and Reporting Issues to Defendants.*** In July 2019, while Annette was reviewing tenant certification information for tenants at Defendants' property in Clinton, Annette noticed that one of the tenants exceeded the income limits that governed the tenant's and the Defendants' ability to receive state and/or federal subsidies for the tenant.

69.     ***Tenant One.*** Annette believed that the tenant in question ("Tenant One") had failed to identify a job on her original Tenant Income Certification ("TIC"), and that, if Tenant One had included the job and the income from that job on the TIC, Tenant One's income would have exceeded the statutory amount necessary for Tenant One to reside at the Clinton property.

70.     On July 22nd, Annette discussed the situation with Gibson, who said, "Only thing we could do is forget the job altogether. It isn't on her application or her move in paperwork. Just drop it [from the analysis.] Don't like to do that but I don't know what else to do other than terminate her[.]"

71.     In other words, Gibson was proposing that Annette falsify the TIC to permit Tenant One to remain a tenant at the property and to permit Defendants to continue receiving the state and/or federal subsidies that they received for Tenant One.

72.     *Tenant Two.* On August 9, 2019, Annette emailed Gibson to advise her (Gibson) that another tenant of Defendants' property in Clinton, Missouri ("Tenant Two") had exceeded the income limits that governed whether Defendants would receive state and/or federal subsidies for Tenant Two's rent.

73.     Later that day, Gibson responded and said, "What if we had her move out, then move back in?"

74.      A few days later, Gibson instructed Annette to make it look like Tenant Two was moving out of the unit, but in reality, the move would just be on the Defendants' books.

75.     Gibson was seeking to evade HUD's auditing system and to hide the fact that Tenant Two's income exceeded the applicable limitations.

76.     Annette had no choice but to do what Gibson ordered her to do in this regard.

77.     *Plaintiffs' Initial Complaints.* On or around September 11, 2019, Annette complained to Jennings and Costello about Tenant Two's income issue and Gibson's order that Annette falsify the records.

78.     On this day, Annette also complained to Jennings and Costello about a bevy of legal violations, the fact that Annette and Bryan believed that Bryan was being discriminated against by

Defendants on account of his age, the fact that Bryan was being forced to work 40 hours per week to get benefits when the handbook stated that benefits were available to employees working 32 hours per week, and the fact that Bryan had overtime hours that he was working that were getting moved to subsequent weeks.

79. The legal violations (referenced in the preceding paragraph) that Annette complained of at this time included:

a. A complaint about a tenant who had requested to move apartments after being stabbed and raped in one of the Defendants' properties. Defendants denied the tenant's request, however, which Annette believed was a violation of the Violence Against Women Act.

b. Defendants' leasing to certain tenants with criminal records (*i.e.* like the tenant in Marshall, Missouri who had a second-degree murder conviction) while denying other tenants with criminal records (*i.e.* like the prospective tenant at Deer Brook Villas who had been convicted of manslaughter). Annette believed this was a violation of the Fair Housing Act.

c. Defendants' decision to charge late fees to some tenants and not charge late fees to other tenants, which again, Annette believed violated the Fair Housing Act.

80. Jennings indicated that she and Lingle and Costello were working on getting "new blood" in CHM's office in St. Joseph, Missouri.

81. ***Plaintiffs' Additional Complaints.*** In August and September 2019, Annette and Bryan also reported various other issues to Defendants, including the fact that a resident had been stabbed at Defendants' property in Clinton, as well as the fact that Annette and Bryan were dealing with a group of incredibly difficult tenants in Clinton, Missouri.

10

82.   **Tenants Three and Four.** One of the tenants ("Tenant Three") was complaining about "mold" in her unit; another tenant ("Tenant Four") had offered to sell Bryan an AR-15 style rifle.

83.   Annette and Bryan had had problems with Tenant Three and the other tenants in Clinton, Missouri, because though many of the tenants would violate the terms of their leases, Defendants would never take action to evict the tenants—while Defendants enforced the terms of their leases at other properties.

84.   This made for an incredibly difficult and hostile working environment for Annette and Bryan to work in and around.

85.   **Employee One.** On or about September 22, 2019 or September 23, 2019, Annette talked with Jennings and notified her (Jennings) about the fact that one of Defendants' employees ("Employee One") had improperly had money deducted from her paycheck.

86.   On October 4, 2019, the Hodges helped complete a "mold inspection" at Tenant Three's unit in Clinton, Missouri; no mold was found.

87.   On October 6, 2019, Lingle sent an email to Annette, Gibson, and Smith, indicating that they needed to begin the eviction process on certain tenants in Clinton, Missouri.

88.   Later that day, Lingle explicitly instructed Annette to begin the eviction process on one of the tenants.

89.   On October 8, 2019, Annette called Gibson, upset after a resident at Defendants' property in Clinton, Missouri, had been verbally abusive to Annette.

90.   Later that day, Lingle advised Annette that they would begin the eviction process and send a letter to the tenant in question.

11

91.     ***Hodges' Additional Complaints.*** On October 8, 2019, Annette and Bryan sent a lengthy email to Lingle, Jennings, and Stephanie Miller (*i.e.* a CHM Board member), outlining a host of concerns and complaints that they (the Hodges) had with various issues at Defendants' properties.

92.     They indicated that they had "grown very concerned as to several of the business practices and discrimination being conducted by" CHM.

93.     Among other things, the Hodges complained in the letter about: (a) a felon as maintenance technician at one of Defendants' properties in Marshall, (b) vendor invoices not being paid, (c) Bryan having to work 40 hours instead of 32 to get benefits or holiday pay, getting paid less/differently than other maintenance technicians, not getting paid time off that he should have been getting, not getting paid for travel; (d) Clinton's residents causing problems; (e) management not supporting the Hodges with problem tenants; and (f) the fact that Annette had located a tenant at the Clinton property (*i.e.* Tenant Two) who should never have been permitted to move into the Clinton property because Tenant Two's income exceeded the applicable limits.

94.     On October 9th, Lingle responded to Annette's October 8th email and stated that he was referring the matter to CHM's Board and that he had "called the president" of CHM to discuss the matter and that a meeting was being set up to discuss the Hodges' concerns.

95.     Later that day, Gibson sent Annette an email in response to Annette's October 8th email and copied Lingle and Smith.

96.     The subject line of the email read, in part, "Per Conversation with Kim Lingle".

97.     The October 9th email concluded with Wallace stating, in part, "Please also know that we all understand the frustration that you are experiencing and we are handling this situation in accordance with the law and Fair Housing. This situation will be over soon, just hang in there."

12

98.     ***Annette's Discovery of Third-Party Verification Efforts at the Clinton, Missouri Property.*** On October 17th, Annette discovered that there were issues at the Defendants' property in Clinton property with the "third-party verification" efforts that the Defendants had been utilizing to comply with MHDC (and potentially other) rules and regulations.

99.     ***Defendants Order the Hodges Off the Clinton, Missouri Property.*** On October 18th, after Defendants discussed the Hodges' complaints internally, Defendants ordered that Annette and Bryan leave the Defendants' property in Clinton, Missouri, immediately.

100.     ***Tenant Five.*** On October 21st, Annette sent an email to Costello and Gibson concerning another tenant ("Tenant Five") whom Annette believed had exceeded income limits— an issue, that, if true, would have caused additional legal issues for Defendants.

101.     The same day, Annette emailed Costello to relay information to her about tenant income issues at the Clinton, Missouri property and about the "third-party verification" issues that she (Annette) had noticed on October 17th.

102.     ***Defendants' "Investigation" of Plaintiffs' Complaints.*** On October 22nd, Costello indicated to Annette that the Board (on which Costello sat) was looking into the various complaints and issues that the Hodges had raised in the last few weeks with the Defendants.

103.     On October 24th, Jared contacted Annette out of the blue and fished for information from Annette about the complaints and issues that she and Bryan had been raising concerning the Defendants and their business practices.

104.     Jared assured Annette that Defendants were not going to "fire" Annette or Bryan.

105.     On October 27th, Annette requested an in-person meeting with the Board to discuss the complaints and issues that the Hodges had been raising with the Defendants.

13

106.    At the time, Annette and Bryan were concerned that the Defendants were retaliating against them for making complaints and raising legal issues with the Defendants concerning the Clinton, Missouri property.

107.    Specifically, Annette and Bryan believed that their removal from the Clinton, Missouri property on October 18th—while dressed up by the Defendants as a removal for safety reasons—was motivated by the fact that Annette was uncovering various legal issues at the Clinton, Missouri property and because of the fact that Bryan was complaining about compensation and benefit issues.

108.    On October 28th, Beaderstadt emailed the Hodges and indicated that the Board was investigating the complaints and issues raised by the Hodges and that the Board would advise the Hodges of the results of the investigation on or before November 15th.

109.    On October 31st, Beaderstadt advised the Hodges that they would not be returning to the Clinton, Missouri property (owned and operated by the Defendants) and that: (a) Bryan would only work for an hourly rate at Deer Brook Villas and lose the income that he had been making at the Clinton, Missouri property; (b) Annette would only work at Deer Brook Villas and would lose the income that she had been making while working at the Clinton, Missouri property; (c) the Hodges' daughter, Amanda Hodges, was no longer needed as an employee; and (d) the investigation into the Hodges' complaints was taking longer than expected and that the Defendants hoped to have a "meeting" with the Hodges on December 2nd.

110.    Annette responded to Beaderstadt that she (Annette) believed Defendants were retaliating against the Hodges and that they needed health insurance for Bryan because of a heart condition that he had.

14

111. Beaderstadt then called Annette back shortly thereafter and indicated that she would ensure that Bryan did not lose his health insurance benefits.

112. Beaderstadt also indicated that, once the investigation was complete, the Board would come and talk to the Hodges about the various issues that the Hodges had raised in the months prior.

113. On or about November 25th, Beaderstadt left a message with Annette indicating that she (and perhaps others) would come down to meet with the Hodges on or about December 9th.

114. In the next few days, Annette learned that Defendants were reaching out to former employees and advising them not to talk with the Hodges and to stay out of the various issues that the Hodges were raising with the Defendants.

115. On or about November 26th, Annette talked with Beaderstadt again and indicated that she (Annette) was aware that Smith had advised Defendants' employees to not speak with Annette and Bryan.

116. Beaderstadt requested that Annette share with her (Beaderstadt) the names of the people (employees and former employees) that Annette and Bryan had spoken with.

117. Later that day, Bryan talked with Beaderstadt, and she said, among other things: (a) that she could tell that Annette and Bryan took great pride in the work they did for the Defendants; (b) that she had noticed an issue with Bryan's pay and would be sending him a check; (c) that she and another Board member were coming to talk with the Hodges.

118. Bryan responded, in part, by asking Beaderstadt whether the Defendants were going to fire the Hodges.

119. Beaderstadt stated in response, "No," and she told Bryan to trust her, that he could believe her, and that her general rule of thumb was to tell the truth because it was easier to remember.

120. Additionally, while Bryan was on the phone with Beaderstadt, Annette called Jared, who indicated (out of nowhere in particular) that he would not be giving Annette any money and asked her "what kind of trouble" she and Bryan "were starting down there."

121. That evening, Annette spoke with several other former employees of the Defendants, including Employee One, Annette Schulte, and Ann Banks.

122. Employee One mentioned that on November 25th, Gibson called her and asked if she (Employee One) had ever talked with Annette—and Employee One said no.

123. Schulte indicated to Annette that she (Schulte) had been fired in October 2018 for saying a curse word in front of one of the Defendants' subcontractors (Kendall) at the Defendants' facility in Moberly, Missouri.

124. Schulte also mentioned to Annette that she (Schulte) had uncovered documentation and other legal issues that Defendants had at the Moberly, Missouri property.

125. Schulte mentioned to Annette that Wallace had falsified records concerning a resident ("Tenant Six") whose daughter had moved in with Tenant Six at the Defendants' property in Moberly, Missouri.

126. Wallace had Schulte fill out a form indicating (incorrectly) that the daughter did not work so that the household (including Tenant Six and Tenant Six's daughter) would not exceed income limits.

127. Schulte mentioned to Annette that the same had been done with multiple other tenants.

16

128.     On November 26th, Annette learned that Smith and Gibson had "unfriended" her and Bryan on Facebook and blocked Annette and Bryan from seeing their activity on Facebook.

129.     Additionally, it seemed that both Smith and Gibson had stopped following the Facebook pages that Annette had created for the residents at Deer Brook Villas and the residents in Clinton, Missouri.

130.     On November 28th, Annette emailed Beaderstadt and indicated that, because of concerns that Annette and Bryan had about the fairness of the investigation that the Defendants were conducting into the Hodges' complaints, Annette would not be providing Beaderstadt with a list of names of people whom Annette had talked to.

131.     Indeed, several of Defendants' employees indicated to Annette and Bryan that they (the employees) were fearful of retaliation from the Defendants.

132.     Annette also advised Beaderstadt that, because of her concerns about the legitimacy and thoroughness of Defendants' investigation into the Hodges' complaints, Annette and Bryan were going to notify various state agencies about issues that the Hodges had raised and the Defendants' failure to properly investigate, assess, and remedy the litany of legal problems that the Hodges had raised with the Defendants.

133.     In early December 2019, Bryan submitted a Minimum Wage Complaint Form and a Charge of Discrimination (for age discrimination) to various state agencies in the State of Missouri and with the federal government.

134.     On December 4th, Annette emailed Lingle to advise him of her concerns that the Defendants—and specifically the Board—were not taking seriously the Hodges' complaints and that the investigation was more like a conspiracy than an actual investigation.

17

135.    On December 9th, the Hodges expected that Defendants were going to come to Deer Brook Villas to meet with them and discuss the results of the investigation that was being conducted into the Hodges' concerns and complaints.

136.    No one, however, associated with either of the Defendants, showed up at Deer Brook Villas to talk with the Hodges on December 9th.

137.    On information and belief, prior to December 13th, Defendants were advised of the fact that, in early December, Bryan had submitted the Minimum Wage Complaint Form and Charge of Discrimination to the State of Missouri.

138.    ***Termination of Plaintiffs' Employment.*** On December 13th, Defendants terminated Annette's and Bryan's employment.

139.    During the termination, Smith indicated to Annette and Bryan—at the same time—that their services were no longer needed effective immediately.

140.    ***Service Letter Requests.*** Following their termination, Plaintiffs both requested, pursuant to Mo. Rev. Stat. § 290.140, a "service letter" from CHM.

141.    On or about January 30th, the Hodges both received "service letters" (the "Service Letters") from CHM, copies of which are attached hereto and incorporated herein by reference as **Exhibits B** and **C**.

142.    The Service Letters are largely identical, and both of them fail to comply with Missouri law in that they: (a) fail to set forth the nature and character of the services rendered to Defendants, (b) do not state the "true cause" concerning why the Hodges' employment relationships with Defendants were terminated; (c) do not state the cause of the termination with sufficient particularity; and (d) are not signed by the Hodges' superintendent or manager.

143. ***Bryan's Amended Charge of Discrimination.*** On or about February 7, 2020, Bryan filed an amended Charge of Discrimination against the Defendants with the Missouri Commission on Human Rights and the EEOC alleging, in part, that his termination on December 13th was in retaliation for the original Charge of Discrimination that he had filed in early December 2019.

144. ***Annette's Charge of Discrimination.*** On the same day, Annette filed a Charge of Discrimination against the Defendants with the Missouri Commission on Human Rights and the EEOC alleging that Defendants had discriminated against her on the basis of her gender and sex and further that the Defendants had retaliated against for the complaints that she had previously made concerning Jared's sexual harassment of Annette and other female employees of Defendants.

145. At the appropriate time, Annette and Bryan will seek leave to amend this Complaint to include claims at issue in Bryan's Amended Charge of Discrimination and Annette's Charge of Discrimination.

## COUNT I – FAIR LABOR STANDARDS ACT
## (FAILURE TO PAY OVERTIME – 29 U.S.C. § 207)

146. Plaintiff Bryan Hodges incorporates the allegations set forth above in paragraphs 1 through 145 as if fully set forth herein.

147. Defendants are "employers" as that term is defined in 29 U.S.C. § 203(d).

148. Defendants, collectively, are "joint employers" of Bryan's.

149. As set forth above, both CHM and MBL had input into the decision to hire and fire Bryan.

150. As set forth above, both CHM and MBL supervised and controlled Bryan's work schedule and the conditions of his employment.

151. As set forth above, both CHM and MBL possessed direct and/or indirect power over Bryan and controlled significant aspects of his employment.

19

152.    Bryan is an "employee" of Defendants as that term is defined in 29 U.S.C. § 203(e).

153.    Bryan is not exempt from overtime requirements contained in 29 U.S.C. § 207.

154.    On multiple weeks during his employment with Defendants, they failed to pay him overtime per the requirements of 29 U.S.C. § 207.

155.    During weeks that he worked more than forty (40) hours per week, Bryan was instructed frequently by the Defendants' employees to "move" the extra hours (*i.e.*, the hours that he worked over the 40-hour limit) into the next workweek.

156.    Defendants, then, would not pay Bryan overtime that he was entitled to under the FLSA.

157.    Defendants were aware of the overtime requirements contained in the FLSA and intentionally and willfully sought to evade paying Bryan overtime that he was due under the FLSA.

WHEREFORE, Plaintiff Bryan Hodges respectfully requests that the Court enter judgment in his favor and against Defendants Community Housing Ministry, Inc. and MBL Development Co. for damages, including back pay, liquidated damages, and attorneys' fees and expenses, and for such other relief as the Court deems appropriate in the circumstances.

## COUNT II – FAIR LABOR STANDARDS ACT
## (RETALIATION – 29 U.S.C. § 215)

158.    Plaintiffs incorporate the allegations set forth above in paragraphs 1 through 157 as if fully set forth herein.

159.    Defendants are "employers" as that term is defined in 29 U.S.C. § 203(d).

160.    Defendants, collectively, are "joint employers" of Bryan's.

161.    As set forth above, both CHM and MBL had input into the decision to hire and fire the Plaintiffs.

20

162.     As set forth above, both CHM and MBL supervised and controlled Plaintiffs' work schedules and the conditions of their employment.

163.     As set forth above, both CHM and MBL possessed direct and/or indirect power over Plaintiffs and controlled significant aspects of their employment.

164.     Plaintiffs are both "employees" of Defendants as that term is defined in 29 U.S.C. § 203(e).

165.     Plaintiffs filed complaints and instituted proceedings with the State of Missouri and the federal government, and/or Plaintiffs caused to be instituted complaints or proceedings with the State of Missouri, and/or were about to testify in such proceedings concerning, among other things, the Defendants' failure to pay Bryan Hodges overtime in violation of 29 U.S.C. § 207.

166.     Defendants discharged and discriminated against and retaliated against the Plaintiffs because they filed complaints and instituted proceedings concerning, among other things, Defendants' failure to pay Bryan overtime in violation of 29 U.S.C. § 207.

WHEREFORE, Plaintiffs Annette Hodges and Bryan Hodges respectfully request that the Court enter judgment in their favor and against Defendants Community Housing Ministry, Inc. and MBL Development Co. for damages, including back pay, liquidated damages, and attorneys' fees and expenses, and for such other relief as the Court deems appropriate in the circumstances.

## COUNT III – BREACH OF CONTRACT

167.     Plaintiff Annette Hodges incorporates the allegations set forth above in paragraphs 1 through 166 as if fully set forth herein.

168.     Annette had a contract with Defendants that obligated her to perform property management services for Defendants in exchange for a monthly payment based on the total number of apartment units that Annette managed during a particular month.

169. Beginning in early 2019, Annette began to manage properties owned by the Defendants—at Defendants' request—in addition to the property known as Deer Brook Villas.

170. Defendants, however, did not pay Annette the per apartment rate that they had agreed to pay Annette for her management services, and therefore, breached their contract with Annette and caused her thousands of dollars of damage.

WHEREFORE, Plaintiff Annette Hodges respectfully requests that the Court enter judgment in her favor and against Defendants Community Housing Ministry, Inc. and MBL Development Co. for damages in an amount that will be proven at trial; and for such other relief as the Court deems appropriate in the circumstances.

## COUNT IV – BREACH OF CONTRACT

171. Plaintiff Bryan Hodges incorporates the allegations set forth above in paragraphs 1 through 170 as if fully set forth herein.

172. Bryan had a contract with Defendants that obligated him to perform maintenance services for Defendants in exchange for payments from the Defendants and various employee benefits.

173. In the event Bryan worked 32 hours or more during a week, Defendants agreed to provide health insurance to Bryan.

174. For many months, however, Defendants failed to provide health insurance to Bryan, even though he worked the requisite amount of time necessary to be entitled to the health insurance.

175. Prior to his termination, Defendants also failed to pay Bryan for "paid time off" that he had used on November 18th, 19th, 20th, and 21st.

176. Finally, upon being terminated, Defendants failed to pay Bryan for "paid time off" that he had earned and accrued, thereby breaching their contract with him.

177. Defendants' failures described above constitute a breach of the contract they had with Bryan and caused him damage.

WHEREFORE, Plaintiff Bryan Hodges respectfully requests that the Court enter judgment in his favor and against Defendants Community Housing Ministry, Inc. and MBL Development Co. for damages in an amount that will be proven at trial; and for such other relief as the Court deems appropriate in the circumstances.

## COUNT V – WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

178. Plaintiffs incorporate the allegations set forth above in paragraphs 1 through 177 as if fully set forth herein.

179. Plaintiffs made complaints to Defendants during their employment concerning the Defendants' disregard of various laws applicable to the Defendants on account of the fact that Defendants rented apartments to low income tenants and received state and/or federal funding in connection with their leasing of said apartments.

180. Specifically, Plaintiffs made complaints concerning the Defendants' violation of various statutes and regulations contained in, among other places, Mo. Rev. Stat. §§ 135.350, *et seq.*, 26 U.S.C. §§ 42, *et seq.*, 4 C.S.R. 170-6.100, *et seq.* and 24 C.F.R. Part 92, *et seq.*

181. The public policy embodied in these statutes and regulations is to provide a tax incentive to construct or rehabilitate affordable rental housing for low-income households.

182. Plaintiffs made complaints to Defendants during their employment concerning the Defendants' explicit instructions to Annette that Annette falsify records or omit material facts from

23

records in connection with the tenant income certifications that Annette prepared and submitted on Defendants' behalf.

183.    Specifically, Plaintiffs made complaints concerning the Defendants' violation of various statutes and regulations contained in, among other places, Mo. Rev. Stat. §§ 135.350, *et seq.*, 26 U.S.C. §§ 42, *et seq.*, 4 C.S.R. 170-6.100, *et seq.* and 24 C.F.R. Part 92, *et seq.*

184.    The public policy embodied in these statutes and regulations is to provide a tax incentive to construct or rehabilitate affordable rental housing for low-income households.

185.    Plaintiffs made complaints to Defendants during their employment concerning the Defendants' unlawful pay practices, including but not limited to, the Defendants' failure to pay overtime to Bryan and the Defendants' unlawful withholding of money properly owed to Employee One.

186.    Specifically, Plaintiffs made complaints concerning the Defendants' violation of, among other statutes, 29 U.S.C. §§ 201, *et seq.*

187.    The public policy embodied in this statute is set forth in 29 U.S.C. § 202(a)-(b).

188.    Plaintiffs made complaints to Defendants during their employment concerning the Defendants' failure to follow the Fair Housing Act's rules and regulations pertaining to renting apartments to low income tenants.

189.    Specifically, Plaintiffs made complaints concerning the Defendants' violation of, among other statutes, 42 U.S.C. §§ 3601, *et seq.*

190.    The public policy embodied in the Fair Housing Act is to provide, within constitutional limitations, fair housing throughout the United States.

191.    Plaintiffs made complaints to state and federal agencies (including the Missouri Department of Labor, the Missouri Commission on Human Rights, and the EEOC) concerning, among other things, Defendants' unlawful payment practices and discrimination.

192.    Specifically, Plaintiffs made complaints concerning the Defendants' violation of the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. § 621, *et seq.*

193.    The public policy embodied in the ADEA is set forth in 29 U.S.C. § 621.

194.    Plaintiffs also made complaints to the Defendants concerning unlawful sexual harassment that was occurring to Annette in violation of, among other statutes, Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, *et seq.*

195.    The public policy embodied in Title VII is to prohibit employers from discriminating against employees on the basis of, among other things, their gender or sex.

196.    As Lingle so eloquently put it, Plaintiffs failed to play in the "sandbox" that the Defendants wanted the Plaintiffs to play in.

197.    The "sandbox," as Lingle would have had it, was a workplace full of lawlessness— one that permitted Lingle to continue to receive state and federal monies even when his companies were in violation of the law, one that permitted Lingle's employees to harass Annette and other female employees, and one that routinely discriminated against tenants in a myriad of ways.

198.    Because they threatened to expose Defendants' corrupt and illegal business practices—and embarrass Lingle, who likes to tout his connections around the State of Missouri and elsewhere—Defendants terminated Plaintiffs' employment.

199.    Defendants terminated Plaintiffs' employment, additionally, because they made the above-referenced complaints to Defendants, to the state and/or federal agencies in question, and/or

25

because Plaintiffs threatened to continue to make complaints and institute proceedings concerning the legality of various business practices engaged in by Defendants.

200.    Defendants' treatment of the Plaintiff violates long-standing public policy embodied in the various laws, rules, and regulations that the Plaintiffs made complaints about and that are specifically set forth above.

201.    Defendants' termination of Plaintiffs' employment has caused damaged to the Plaintiffs in the form of lost wages, lost future pay, lost employee benefits, lost future employee benefits, humiliation, and emotional distress.

WHEREFORE, Plaintiffs Annette and Bryan Hodges respectfully request that the Court enter judgment in their favor and against Defendants Community Housing Ministry, Inc. and MBL Development Co. for damages in an amount that will be proven at trial; and for such other relief as the Court deems appropriate in the circumstances.

## COUNT VI – VIOLATION OF SERVICE LETTER STATUTE

202.    Plaintiff Annette Hodges incorporates the allegations set forth above in paragraphs 1 through 201 as if fully set forth herein.

203.    On or about January 30, 2020, Defendants mailed a Service Letter to Annette Hodges pursuant to Mo. Rev. Stat. § 290.140.

204.    The Service Letter, however, does not comply with the requirements set forth in Mo. Rev. Stat. § 290.140, because it, among other things: (a) fails to set forth the nature and character of the services rendered to Defendants, (b) does not state the "true cause" concerning why Annette's employment relationships with Defendants were terminated; (c) does not state the cause of the termination with sufficient particularity; and (d) is not signed by the Hodges' superintendent or manager. *See* Exhibit B.

205. Defendants' failure to satisfy the terms of Mo. Rev. Stat. § 290.140 has caused Annette actual damages, and it will continue to cause her damage going forward.

206. Defendants' failure to satisfy the terms of Mo. Rev. Stat. § 290.140 is outrageous and is motivated by the Defendants' evil motive and/or reckless indifference to the rights of Annette.

WHEREFORE, Plaintiff Annette Hodges respectfully requests that the Court enter judgment in her favor for actual damages, nominal damages in the event no actual damages can be established, punitive damages, and attorneys' fees and expenses; and for such other relief as the Court deems just and proper in the circumstances.

## COUNT VII – VIOLATION OF SERVICE LETTER STATUTE

207. Plaintiff Bryan Hodges incorporates the allegations set forth above in paragraphs 1 through 205 as if fully set forth herein.

208. On or about January 30, 2020, Defendants mailed a Service Letter to Bryan Hodges pursuant to Mo. Rev. Stat. § 290.140.

209. The Service Letter, however, does not comply with the requirements set forth in Mo. Rev. Stat. § 290.140, because it, among other things: (a) fails to set forth the nature and character of the services rendered to Defendants, (b) does not state the "true cause" concerning why Annette's employment relationships with Defendants were terminated; (c) does not state the cause of the termination with sufficient particularity; and (d) is not signed by the Hodges' superintendent or manager. *See* Exhibit C.

210. Defendants' failure to satisfy the terms of Mo. Rev. Stat. § 290.140 has caused Bryan actual damages, and it will continue to cause him damage going forward.

211.     Defendants' failure to satisfy the terms of Mo. Rev. Stat. § 290.140 is outrageous and is motivated by the Defendants' evil motive and/or reckless indifference to the rights of Bryan.

WHEREFORE, Plaintiff Bryan Hodges respectfully requests that the Court enter judgment in his favor for actual damages, nominal damages in the event no actual damages can be established, punitive damages, and attorneys' fees and expenses; and for such other relief as the Court deems just and proper in the circumstances.

## COUNT VIII – VIOLATIONS OF MO. REV. STAT. §§ 290.080 AND 290.110

212.     Plaintiff Bryan Hodges incorporates the allegations set forth above in paragraphs 1 through 211 as if fully set forth herein.

213.     Prior to terminating Bryan's employment, Defendants failed to pay him all of the wages he was entitled to within sixteen (16) days of the close of the pay periods that Bryan worked.

214.     Specifically, Bryan had accrued "paid time off" that he used from November 18-21 that Defendants did not pay him for in violation of Mo. Rev. Stat. § 290.080.

215.     Additionally, when Defendants terminated Bryan's employment on or about December 13, 2019, they did not pay him the wages that he was entitled to.

216.     Specifically, Bryan worked thirty-two (32) hours for the week beginning on December 2nd.

217.     Bryan also worked thirty-two (32) hours for the week beginning on December 9th.

218.     Bryan's final paycheck, however, was only for thirty-two (32) hours, meaning that Defendants shorted him thirty-two (32) hours of pay in violation of Mo. Rev. Stat. § 290.110.

WHEREFORE, Plaintiff Bryan Hodges respectfully requests that the Court enter judgment in his favor for actual damages and all other damages recoverable under Mo. Rev. Stat. § 290.110,

attorneys' fees and expenses; and for such other relief as the Court deems just and proper in the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury for the foregoing causes of action.

## DESIGNATION OF PLACE OF TRIAL

Plaintiffs hereby request the trial be held in Kansas City, Missouri.

## CIVIL COVER SHEET

Attached as **Exhibit A** is a copy of the Civil Cover Sheet.

**HKM EMPLOYMENT ATTORNEYS LLP**

By:     */s/ Brad K. Thoenen*
Brad K. Thoenen, KS 24479
bthoenen@hkm.com
John J. Ziegelmeyer III, KS 23003
jziegelmeyer@hkm.com
1501 Westport Road
Kansas City, Missouri 64111
816.875.9339

ATTORNEYS FOR PLAINTIFF